The next case is Jose Daniel Guerra-Castaneda v. William P. Barr, Appeal Number 191736. Counselor, are you ready to proceed? Yes, I am. Thank you, Your Honor. Could you reintroduce yourself for the record one more time, please? My name is Gilles Bissonnette with the ACLU of New Hampshire. I represent the petitioner, Jose Guerra-Castaneda, in this case. Thank you. For a petitioner, our plan, just to make the court aware, is to present for 12 minutes on the issues of contempt, with five additional minutes presented by my colleague, Attorney Kim, on the underlying merits of the immigration petition for review that's been filed. And with the court's permission, we'd like to reserve three minutes for rebuttal. You may. Thank you, Your Honor. Our contempt request in this case stems from the government's undisputed violation of this court's orders in ultimately removing the petitioner to El Salvador on September 13th. But this just wasn't any violation. This isn't a discovery violation, for example, because this violation ultimately led to serious, irreparable harm to the petitioner, who was ultimately detained in El Salvador for 10 months and was subjected to starvation, a beating, and horrendous living conditions during that time. The very type of treatment that he was frankly trying to avoid in attempting to seek relief before this court. This is a real person who suffered real and, we think, outrageous harm. And the government even deported him in violation of this court's orders, knowing full well that he was ultimately going to be detained in El Salvador. That was the very point of our motion to stay that was ultimately granted before this court. But the government even went a step further. Not only did they deport him to El Salvador knowing that this detention would occur, they actually hand-delivered him to the Salvadoran authorities. And even in the face of this violation, the government, in our view, has done very little to correct its error. If the government, frankly, is not going to take responsibility for this egregious violation, then we believe the court needs to hold the government responsible. So we believe that a finding of contempt, along with a meaningful sanction, is essential in this case, not only to be clear that the government's violation was unacceptable, but also to affirm the authority of this court and, frankly, to ensure that this court's orders are followed in the future by the government. At this point, assuming we may share your outweighs, the El Salvadoran government at this point refuses to allow him to leave the country. There's very little that the United States, without cooperation from that government, can do to facilitate his return. I think I have two points to that, Your Honor. The first is, as to the threshold question of whether this court should find the government in contempt, the impossibility to cure doesn't play a role here. And, in fact, I think the government conflates this defense of a possibility to cure with what is actually a true defense in a contempt proceeding, which is the impossibility to comply with a court order. Here, there is no dispute that the government had the ability to comply with this court order. There is no dispute that it was not – sorry. The government had the ability to comply before it didn't, but now that it has reported him against our court order, the government can do very little without some cooperation from El Salvador to facilitate his return. So assuming we thought the government civilly contemptuous, there's nothing that we can do to coerce the government into compliance because compliance is beyond their control. I actually don't agree with that, Your Honor, and I want to explain why. But first, this question only goes to the propriety of the sanction. It doesn't go to the threshold question of whether the government should be found in contempt. All the elements of civil contempt are satisfied. And there is no impossibility issue because the government had the ability to comply. But as to the impossibility to cure, which is, I think, more applicable to the propriety of whatever sanction this court wants to impose, there's a lot of things that the government could do today, and they haven't done it. Number one, as we articulate in our status report, our client was released on July 6th. He actually, if he receives permission from the Salvadoran court, could leave El Salvador. There hasn't been any effort on the United States to either engage the petitioner or engage the Salvadoran authorities or the Salvadoran courts to see whether that is even possible. That's something that could have happened in the last couple weeks. Nothing has happened. In addition, the government could apply pressure to help ensure that his appeal is resolved expeditiously. His appeal for the homicide charge is in limbo. They're awaiting a third judge to be appointed to resolve it. That's something the government could do. And in addition, at the very least, the government could provide protection to the petitioner, something that we have requested now that he has been released. We made that request in our status report. We even followed up with a separate e-mail communication with the Department of Justice asking for that type of protection, which is really the bare minimum. How can the U.S. government help him be secure in a foreign country? I think there's several things that at least could be tried, but the reality is nothing has actually been tried to our knowledge.  Give me an example other than, say, give him asylum or something in an embassy. That is an example. They could have armed guards outside the place where he's staying. I'm not going to say where he's staying. They could work with the attache to provide security. All of those things, I think, seem well within the realm of possibility here, and we've received nothing. The government put him in this situation. Not only was he subjected to horrible treatment for 10 months. Now he's out. He's been out for over two and a half, three weeks, and the government's done nothing to protect him, which was the basis for his petition for review before this court to ensure that he wouldn't be killed. That's why he wanted to stay in the United States, and the government won't even provide any modicum of protection while he's in El Salvador. What does the record show has been actually requested of the government and denied? I'm sorry? What does the record show has been actually requested of the government and denied? We made a formal request through our most recent status report of approximately two weeks ago for protection. What's the status of that? The status of that is we received an email from Department of Justice counsel saying it was going to be forwarded to ICE. That was two weeks ago, and we've heard nothing, and we are very, very concerned about that. If they're not going to return him, which we think the government hasn't even gone through the process truly of seeing whether that's a possibility, at the very least they could do that. What was the request for protection? What did you ask for in terms of protection, or is it just a general request? It was a general request in a status report. And I think what we anticipated is that that would hopefully start a conversation with the government, where the government would go through some modicum of due diligence to see what was possible. That conversation never happened, incredibly. When you say never happened, give me some sense of the chronology. Remind me when he was released. Yes, Your Honor, he was released on July 6th of 2020, and I believe it was maybe off a day or two. That's five minutes. Thank you. I believe it was two days later. We then submitted a status report informing the court of the release. And then additionally, we then forwarded that status report to the Department of Justice, basically telling them that we made this request to the court and that we're making this request to the government. And we don't even have that in the record, that communication between you and them. You do not have that. That is true, Your Honor. You do not have that in the record. What is in the record is the status report itself that we separately forwarded to the government with that request. I want to go back just to the step-by-step violations that happened here. Before you do that, my understanding is that the government has represented to us that in response to the violation of the state order, they have made efforts to have him returned. I understand that those efforts are unsuccessful, but are you saying that they have not made any efforts? Or are you saying the efforts have not been as aggressive as you would like them to be? I don't think they've met their showing that they really have done much of anything since October. Do you agree that they – I assume they've been in touch with the government there. Yes, they have. In fact, the status reports reflect that as soon as this contempt issue arose in September and up to early October, the United States government did engage the El Salvadoran attache about the possibility of removal. But from the status reports that we've received from the government, and it is their burden to show impossibility, I haven't seen anything, any indication of subsequent communications since October between the United States government and El Salvador. And that is one of the concerns that we have, frankly, with the government status reports. At some point during this process, up until early October, the government washed its hands of our client. That is the impression we have because the status reports of the government don't reflect that the government has done anything since at least early October. And certainly the situation at the very least has changed since July 6th where our client's been released. But again, no effort, no engagement from the government as to what, if anything, the government could do. So the government talks, again, about quite a bit about how strong. Are you going to spend any time on the merits? Yes. In fact, I'm actually going to yield the remainder of my time, and I forgot to turn on my phone. So I actually don't recall how much time I have left. But I am actually going to now, unless the court has further questions on contempt, pass on the immigration merits to Attorney Kim. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is Sangyeob Kim for Petitioner. Your Honor, we believe in this case the court can reverse the decision of the agency and vacate the order and remand the proceedings to the agency for two reasons. Number one, because of the failure to consider evidence, especially for the CAT claim, and also in light of what happened after the deportation in violation of the court's order. So let me start with a failure to consider the evidence. Neither the immigration judge nor the BIA considered the evidence that he was going to be detained in one of the prisons governed by the extraordinary measures. And I'm just going to refer to them as gang prisons. Now, BIA appears to agree that severe human rights violations are happening in those prisons. Yet they denied the CAT claim because, quote-unquote, he has not submitted any evidence that he will go there. But there is specific evidence, and record compares the opposite conclusion. So there was specific evidence, documentary evidence, red notice issued by the Interpol accusing him for homicide and also indicating that he was an active gang member. Now, based on that evidence, the probability of him being detained in one of those prisons was about 80 percent. That's based on simple calculation of percentages in the record. Can I ask you on that point, is that evidence inconsistent with the statement that there was not any evidence that he will go to such a prison? In other words, what I was – what I'm asking is you presented probabilistic evidence, and then there's a non-probabilistic statement by the court that there's not any evidence that he will go there. Are those two inconsistent in your view, and if so, why? Your Honor, so the evidence is if a person is either a current or a former gang member, then 80 percent of the gang members are detained in those prisons. So if the agency's position that he has not submitted specific evidence that he will not go there, then the record compares the opposite conclusion. Well, you're just repeating the point that I'm asking you about. The statement is not a probabilistic statement that the court made. The court said there is not any evidence that he will go there. Well, there's not any evidence that he actually will go there. There is evidence that there is a likelihood that he will go there. And I guess what I'm asking, one possibility is we could read that statement to say it ignored the probabilistic evidence. Another possibility is it did not ignore the probabilistic evidence. It just didn't give it the weight that you think it should be given and that that would be its own independent error. If it's the latter, I guess to get to the likelihood scenario, because it's likelihood of torture, not likelihood of going to the prison, you'd have to multiply the likelihood of him going to the prison plus the likelihood of what would happen once he was there. You seem to be making the argument that we have to read the IJ as if it ignored that evidence altogether. Yes, it is our view that IJ, BIA, the agency as whole, they completely ignored the evidence when they were aware of the same thing. Is there a reference to it in any of the opinions in the fact sections, that evidence? For instance, the immigration judge found them, the entire agency, including the BIA, emphasized the existence of the red notice issued by Interpol. For example, the immigration judge found them not credible when he maintained his innocence. Is there any reference in either the IJ or the BIA opinion to the evidence, the document, that sets forth the 80 percent? No, Your Honor. There's no evidence. There's no analysis. There's nothing there other than one simple statement that he has not presented any evidence. Is the CAC claim moot now? It is not moot, Your Honor, because a litigant can continue litigating the case even outside of the United States. That's emphasized and explained by the Supreme Court in Nikin v. Holder. No, I don't mean because of the removal against our order. I mean because of his present status. We now know he's not in one of those prisons, right?  So if the court is inclined to consider what happened after his deportation as part of the instant petition for review, then nonetheless, regardless, the CAC claim is not moot. Because his CAC claim was not just focusing on the extraordinary measure-based prison claim only. It also covered the likelihood that he would be tortured by gang members, extermination group, and the Salvadoran National Authority. So it was not just solely on the extraordinary measure-based. Let me then see. I understand what you're saying. There are two points, and one wouldn't be moot. But are you – do you have a – what's your response to whether the CAC claim, to the extent it's based on being put in a prison and subjected to extraordinary measures, is now moot? Since I don't understand there's a current – if he had been hit by a car and killed, would the CAC claim be moot? If he dies, then we believe the instant petition for the immigration relief could be moot. And if we now knew that – if there was – if we now knew he wasn't going to one of those prisons, would that be moot? We don't know that, Your Honor. So he had three criminal charges. One was illicit organization charge, second was terrorist organization charge, and third was homicide. And one of the illicit or terrorist organization charges was dismissed conditionally. So what that means in Salvadoran context, if the Salvadoran authority can come up with additional evidence to recharge him with either terrorist organization charge – Isn't there a more fundamental – how can it be moot if the government is representing to the court that they're trying to bring him back to this country so that the asylum and withholding claims can be – and the CAC claim can be heard? Because we don't know after they're heard and that he's sent again where he'll be sent. From the government's perspective, we're supposed to be thinking about this ex-ante. They haven't represented to us that the petition's moot on that score, have they? I thought they were making the opposite argument to us. No, I believe the government is taking the position that the court cannot consider any evidence outside of the closed record, the administrative record, which is why the government is not even arguing what would be the proper relief, whether the mootness issue kicks in if the court – That's right. If Your Honor – Could I just ask you about the asylum? Yes, Your Honor. You want to just talk about the merits of the asylum? Yes, Your Honor. So if the court is inclined to consider additional evidence because of what happened in violation of this court's order, the petitioner's asylum and also withholding claims are significantly strengthened because one of the theories that he advanced was incorrectly accused of a suspected gang member-based persecution social group claim. Now he has been acquitted. Now he has been released. He fears for his life because he does not know where to go, and he fears that he could be possibly killed by, persecuted by three sources I mentioned, gang members, extermination groups, or Salvadoran authority. And the record, even the closed record we submitted, the petitioner submitted, supports that as a presumed gang member, he could end up being persecuted. So we believe that if the court is inclined to consider evidence outside of the record, we believe that his asylum withholding claim based on that specific theory is significant. I thought there was a child abuse theory as well. Is that – am I wrong? Yes, Your Honor. So there were three claims. One was child – Can we just discuss that claim for a moment? Yes, Your Honor. What was the error in your view there? Yes, the court – I'm sorry, the agency did an error because it found that there's no nexus issue. So petitioner advanced the argument that because he did not have any physical control or legal control over the relationship between his abusive mother and himself when he was young, he asked the agency to found that he has met the burden for persecution on account of immediate family relationship. And obviously he was not specifically aware of the actual motive but because he was a minor. But nonetheless, the relationship between him and his mother was not something that he can just cut off and just run away from it. What's the evidence that you have of the mother's motive being that it was on account of his child's status? His status as her child. Yes, Your Honor. That's really based on his specific testimony that he was abused by his abusive mother. There was no other – He testified that his mother made certain statements about regretting that he was born and things like that, right? Yes, Your Honor. The mother mentioned that she should not have him at all. And government considered that part of the record as personal dispute, and it is our position that's not personal dispute, but that's because of the relationship between his mother and him. And for that reason, he made an argument that the charges – the abusive – the action was on account of the immediate family relationship. Now, I believe it's very important to note that it is true that he's no longer a minor. It is true. But if he has met the burden for past persecution, then he could be eligible for humanitarian asylum at minimum. So if the court finds that that nexus issue of the abusive mother's action upon him is dispositive enough to reverse the agency's decision, then the court should remand the case to the agency so that the agency can consider the humanitarian asylum or any other dispositive aspect of the asylum and withholding. Because the BI did not address many parts of the IJ's reasoning, including but not limited to the timeliness of asylum application, the issue of credibility, whether the Salvadoran government is capable or willing to protect him from private harm. So there are many issues the agency should consider in the first instance. Honest, Your Honor? Yes, Your Honor. If he's found guilty of the charges, is it still your position that he would be entitled to asylum relief on the assumption that the prison conditions there are so severe that no one should be subjected to what sounds like torture? Your Honor, I don't want to speculate that he's going to be convicted. But if he gets convicted of homicide, which is the only remaining charge, then he can still eligible for CAD because the defer of remover under the CAD is not barred by nonpolitical serious crime outside of the United States. It's not barred by particularly serious crime. So he would still be entitled to at least the defer of CAD. That's the regulation and the statute that we interpret in terms of the eligibility. Just to this point, and maybe it's premature for our purposes to wonder about this. There's some suggestion in the chat part of the briefing that challenges the disregard of the state order that he was prejudiced by this in a way that should affect the relief that we grant on the withholding and the asylum claim. As the colleague we just have, as you suggest, it's not evident to me that his absence of being in this country affects his ability to make the arguments to us about those issues. So one, can you address that? But two, if we remand because of an error that we find as to the withholding claim or the asylum claim, is the record then open or how will it affect his ability or will it affect it at all to litigate those claims if he remains in El Salvador? To start with you on our first question. I apologize. Could you repeat the first question? I'm sorry, your honor. Yes, there was a suggestion in the previous prejudice of the violation of the state order needed to give him the relief he seeks because he's been prejudiced in seeking the relief. Right. Thank you, your honor. And I apologize again. At that time when we did a brief, we were not aware, we were not sure what was happening inside of the facility where he was detained because he was basically incommunicado. And one of the concerns that we had was his death. So under our theory, if he dies while he's in pretrial detention waiting for the criminal proceedings, his entire petition could become moot. Then this judicial review and the fact that this court ordered the government to stay deportation in order to make the status quo of the case, his judicial review would become meaningless. So that's an aspect that we argued in our due process argument that the court and to the extent we did not advance the argument that he should be entitled to asylum withholding care just because he was removed in the middle of the petition. But what we asked was, if we were to remand on either the asylum or the withholding claim, is the record open at that point? Or is there I mean, what will be the effect of him being not in the country at the time of the remand? Or is that going to be just the record will be just the same record that we're looking at now? The court can provide an instruction to the agency to allow the petitioner to have an opportunity to supplement the record because of what happened. And obviously, it could depend on the procedure juncture of his criminal case, the appeal, and also depends on the outcome of his criminal case. But the court can at least provide instruction for the agency to consider evidence because the instant case is sufficiently compelling circumstance. But if there's going to be an opportunity to supplement the record, and if a normal course, you would want to supplement it with facts that can only be effectively put in through your client. Then don't we still have the problem Judge Baron is inquiring about, which is because he was sent back, your client would not be able to testify at a reconvened IJ proceeding. Yes, yes, your honor. That's one possibility. But what the B.I. can do is if the court provides an instruction that B.I. should wait and confirm and allow the opportunity for petitioner to supplement the record. And once the B.I. has all the record and B.I. can send a case to the age to the immigration judge. And that I presume that that would be after him being returned to the United States, your honor. So we are not asking the agency to examine the evidence without having. Why do you presume he'd be returned? I mean, the rest of your contempt request is that if there's no contempt issue. He's not going to be returned because El Salvador is not cooperating. So I guess the question is, what is that? Maybe it's all premature, but I just would like to have some idea of what is what's the effect of a remand? If we're remanding with the contemplation that it would allow the reopening of a record. Would he be able to participate in that since he's been released by video or something in that proceeding? We can we can find a way, your honor. We understand your honor's concern. And we can find a way in vehicle so that he can participate. His hearings, at least through telephonically or video, even though we are not. We are not disclosing his location. We had as soon as he was released, we have arranged some medical evaluation for him to take. And we have provided some support and we have communicate with a client effectively through a phone. So even if the phone is not not the adequate tool to for the agencies to examine the evidence and hear the argument and supplement supplemental record, we can arrange video. And of course, the government's embassy. It is my understanding that the embassy has the video capacity capability to arrange those hearings inside of the embassy. I don't see why the government would not be willing to provide their support when it is all the government who has caused this problem. If you have any question, this concludes my argument. Thank you, your honor. Thank you. Could you introduce yourself again, counselor? Of course, your honor. May it please the court. I'm Scott Stewart on behalf of the attorney general. Are you ready to proceed? I am, your honor. Thank you. May it please the court. In this case, the board of immigration appeals upheld the denial of petitioner. Jose Daniel, where a castanetas applications for asylum withholding of removal and protection under the convention against torture. The record supports the agency's rulings. This court should deny the petition for review, discharge the order to show cause and deny the motion for sanctions. I'd like to begin your honor by just emphasizing with respect to the erroneous removal here in the violation of this, this court's order. I should say I'm the deputy assistant, the deputy assistant attorney general in the civil division at main justice. I oversee the office of immigration litigation. I want to make clear to the court that this is a very serious matter to us. We're sorry for the violation of the court's order. This is this was an unfortunate problem. We, as we tried to explain without without making an excuse, this was inadvertent. We do acknowledge the error and and we've moved to take remedial actions to address it, to address the court's concerns. So we understand the seriousness of it. What have you done? Sure, your honor, we, we have, as we've explained in some of our submissions, we've tried to make it. So taking steps with with the relevant ice offices, the Boston field office, the staging facility here to remind people to timely update, to give notice to, to hit the stay of removal alert tab, as well as the comment section to return folks who have been taken to a staging facility back to the appropriate facility. Field office to kind of add a number of bulwarks so that it will be hard for this series of factors to to combine to have this happen again. Your honor. Well, what have you done to secure his return? Sure, your honor, I think so. In addition to to some of the points we've described in our status reports, in addition to just looking into feasibility, given the outstanding criminal case. My understanding is that has twice reached out since since we received the petitioner's status report on on, I believe, was July eighth on. We've twice reached out to the El Salvador attorney general's office to inquire with them. We have not circled back with the court because although we've received notice of confirmation of of of our request, our, our message to the, the El Salvador attorney general's office, we haven't heard heard word exactly as to where things stand. We can update the court when we hear hear more from from them, but we have checked on things and I can I can report more more on that. When, when I, when I hear more, I think where we stand now, though, your honor, is that we still have this difficulty of bringing the petitioner back to the United States while his criminal proceedings remain unresolved. We identified in that earlier status report and we still have that present barrier, but we've been throughout this time. Questions on have you inquired into the allegations of mistreatment that he suffered in the detention? I, I'm not sure that we, we, we have we have done that. Why hasn't the government, I mean, that would seem to be the type of thing that the very point of the order was to give the litigant an opportunity to make the case. He shouldn't be sent there because of his first mistreatment. And I would think if you were trying to make sure that we were as close to the status quo ante as possible as you're representing that the allegation that he actually suffered the mistreatment would be of great concern. Understood your honor. I can, I can see what we can, we can try to find out there. I think this is, as your honor knows, it is, it is a sensitive kind of area. We are dealing with a fellow sovereign government and we do, we do take understood that the, the, the, the points that the allegations of petitioner is made regarding his imprisonment. You know, if we can, I can see what, what we've inquired as to that understood your honor. And then it's, it's very odd that knowing that today was oral argument, you would not have reached out so that you could have some answers for us. It's again, your honor, we, we've, we're somewhat in a limited just position, but in what we can, I think, feasibly do until criminal proceedings are resolved. But if the court does have more particular information, I can go go try to try to track more of those things down. We've, we've tried to get again. I think it's have you responded to the request for security protection. We have not, your honor, I imagine that that would be a difficult. Well, why would you imagine it? I mean, you, you, there was a request for protection for security. It's not difficult to respond to it. I mean, has there ever been any effort to, is it just been ignored? I don't understand the position of government saying that we've been represented that he was released. He was concerned for security and they were, you were reached out to. Is the government's response that that's not the type of thing you have to respond to? I think we'd, we'd want to be careful before we, we take the step to provide. That's not my, my first question is, is it the government's position that you don't have to respond to that request? I don't think we were saying that we shouldn't respond to the request. I think I did to it. I think we've, we've, we, we, we have not specifically addressed that your honor. I mean, I think we plan to respond to the, to the request. I think we're trying to find out more information just in light of the release your honor. I, I, I can look, I can look more into to that and try to see if I can get something more, more concrete. When you say, when you say, when you say we, who do you mean? Who's actually, who's, who's having the contact with El Salvador? Sure. Your honor, it's, it's we've noted, let me just make sure I have the, the right DOJ's criminal division, the office of prosecutorial development assistance and training in, in El Salvador, your honor. Or I believe they're the ones who have the communications, I should say. And have you been in touch with those officials? I, I, I believe we, we have been in touch with those. Have you been in touch with those officials? I have, I have not personally, personally engaged with those officials, your honor. Who have you, have you been in touch with anyone who has been in touch with those officials? People in our office, you know, have, have reached out to those, those folks, your honor. And you've spoken to those people? Yes, your honor. I, and I can, I can get. What did they tell you about what those people were told by the Salvadoran officials? I mean, I, I think the, the latest we have on that, your honor, is what we've, we've indicated in our, in our status reports. And, and, and, but I, again, we, we don't have the latest information from the, the attorney general's office in El Salvador in response to the release and just where things stand there, your honor. But I can, we're, we're working on it and I can follow up and give the court more information when we have, we have something to, to notify the court of. So do you know the name of the person who's contacted El Salvador? I, I, I don't have, I don't have the name, name in front of me, your honor. Okay. And do you, do you know what, what he, what he said to try to convince El Salvador to send this fellow back? I, I, I don't have, I don't have, have that, your honor. Again, I think we've been proceeding on the understanding that we're, we're pretty limited in what we can do until the criminal proceedings are, are resolved. And, and. Is that true with respect to protection? I don't know the answer to that, your honor. I, I, I. Will you give us an answer to that? I can try, I can work to get that answer on, on protection, your honor. Understood. So to be, to be clear, you get a letter saying this guy's outside of prison now. He's at risk of being killed, he alleges. He's only there because in violation of our order, your client sent him there. And yet, apparently that hadn't yet prompted you to pick up the phone and say, tell me what we can do to get him protection. Am I correct? I think, you know, I, I, I don't, I don't know about that, your honor. I mean, I think we're in kind of a difficult circumstance with the COVID pandemic and we've just, it's been slow to get responses, regrettably, but we can push to try to get answers on that. But you haven't made an inquiry. That's what's troubling. So, I mean, you're, if you're not the person directly responsible for following through, who in your office is, or who in Washington is, and, and who's taking this seriously. There's a pending motion to adjudge the government in contempt. And it sounds like it being more contemptuous. I don't, I don't think so, your honor. I think, again, we've, we have here a difficult situation where we're, we're trying to get more information on it. We're tracking it and I can, I will get more information in response to your honors questions. I understand the court's concerns and I will, I will, we'll follow up and get more information. Like, but when you say we're trying to look into it, I go back to my question. Have you even had a phone call with anyone regarding him getting protection as he's standing there right now? I, I, I don't know that I have not had that phone call your honor. I think, you know, we've tried to reach out to our, our, our normal channels that we've been dealing with to get this information. It's just a, it's, it's not a. How do you try to reach out without picking up your phone? I understand your point. We can follow up. Would it help would it help perhaps if we issued an order saying the United States violated the attorney general violated 1 of our. Orders and apparently the. People handling it in the office do not feel a sense of urgency. And we're asking the attorney general to pay attention to this personally and advise us the attorney general himself. What's being done with that assist you. Your honor, I don't think you need to. I. We will follow up and we will get get information in response to the court's questions. We understand what the court is focusing on. Maybe you could just help help me. So we're on the same page. When you say you'll get us information. What do you mean by that? What is the information you think you need to provide? Sure, your honor. What we can learn about the feasibility of returning the petitioner to the United States, whether anything on that has changed, whether anything can be done with respect to protecting him in response to his claims of harm and the like while he's in El Salvador. And who do you think is responsible for providing that protection? Is that your understanding? Is that you need information about whether El Salvador can provide the protection? Or are you going to inquire about whether the United States government is going to be able to provide him protection? I think I need to find out just what. And whether they're what the options may be your honor. I haven't. I just have not. Have not seen precisely this situation and I don't want to be just presumptuous by by concluding what would what would be feasible in a foreign country for somebody who is under criminal charges like this. I want to be just careful about that. You know, we scheduled the merits hearing as well as the hearing on the contempt motion for today. It's just shockingly unreasonable for you not to be prepared to address both. I apologize for not for not having these answers, your honor. I will say that it my understanding is it's been difficult to get some answers in in these recent weeks. I'm sorry to the court that I don't have better answers, but I will follow up expeditiously to get the court answers to the questions that your honor have been asking. Is there a plan to respond to counsel's request for protection in other words to contact with the representation to us is that there was a request to the United States government for protection that's gone unanswered for two weeks. I understand you're going to try and get information about your options are. Do you have any plan to contact them in response to it to acknowledge that you've received it and give them a sense of what you're doing with the timeframe. We will do that your honor. We just we didn't have having not heard more information from El Salvador about what's available. I just don't think we had. Unfortunately, more to report, but we will we will respond and and let them know what we have found out. Have you talked to anyone in the embassy. I have not your honor. Has anyone in your office talk to anyone in the embassy or in fact anyone in the entire State Department. Um, I, I, I'll need to recheck our, our submissions on that your honor me I think we've mostly been dealing with with ice and with engaging the the appropriate folks in DOJ to engage the El Salvador and government your honor. I, I think that's the latest I kind of, I kind of have there. I'm sure I'm sure it's not the case, but I think you should appreciate the way it comes across is that you and whoever you're working with really don't care that much. It's not much of a priority to them that this guy is facing death because of a violation of our court order. I, you know, I, I'm, you know, I, again, I'm sorry your honor. I didn't mean to leave that impression. I think, you know, this is something that we responded very rapidly to we regret it very much. It is a big problem. We acknowledge the error. We, we've tried to take steps to address it. We have a tricky circumstance where we have somebody in a foreign country involved in a foreign criminal proceeding. It's just, it's very, it's, it's difficult to just get information about that and take the, the appropriate options, but I will, we will follow up and get this try to get this court clear better answers and we will circle back as well with petitioners. I would just note that this happened last year. That's how long this has been going on and removed from the country in the fall of last year. Understood your understood and we understood that the court took it very seriously. We take it seriously as well. Again. I understand that. I, I, the court wants more answers and we will probably work to to get get answers and keep the court apprised again. I, I do don't want to send any miss misimpressions about the importance of it and and we will work to get those answers because we hear the court and what the concerns are that you have identified five minutes remaining. If I may, your honor, I want to make sure to address the merits, the merits briefly here with the time I have left. I, I would argue your honor that the, the agency here came to reasonable conclusions as to both both the asylum and withholding issues as well as the convention against torture issue. These are questions of substantial evidence. The agency's conclusions are well supported by by substantial evidence. The, the, the key point, I think, on that, that addresses most of the, the asylum issues your honor was just the lack of a demonstrated nexus in this case. The, the, and the, they applied the right standard recognize that the harms that petitioner claim regarding his mother and his stepfather. He just had not established that a central reason for that was a family relationship similar with. And she said I wish you were never born. We don't understand that was because it was the child. Again, she, there was there was that evidence your honor but again it's the, the record also contained evidence on page 178 and page 200 of the administrative record, where the petitioner said, you know, I don't know what my mother's motivation was. Right, your honor but but but but it gets into the question of what what the record compels the conclusion up. Well, the record. Is there anything to suggest, he's simply saying he doesn't say I know it wasn't because I was a child he was a child. He was a child. She abused him completely saying he was a burden. Why was he a burden, other than the fact that the family relationship. And she said I wish you were never born, what goes in the other direction. Sure, you're on I mean one is that it just, it has to be clear that the actual reason is the family relationship and these can be people who mother and stepfather, they're mean to, you know, whoever's around whoever small it doesn't happen. Is there anything in the record to suggest that's the case that they're mean to small people. Well, the, I, there isn't your honor what the point that I'm getting at is that when you're looking at a petitioner who has to carry a burden of showing that the harm is that the protected child supposed to know why the mother is abusing your honor I mean I again it's, it's, it's, it's just a requirement of the statute, and the requirement is that there'd be a nexus not that the victim, be able to attest to the motive. The victim only has to put forward evidence as to the motive, and the evidence as the motive the victim put forward was the statements of the mother and the obvious fact that the statements all accord with the familial status which is why the child was a burden. Most small people are not a burden to her, a child her own child is because she has a responsibility to that person. That's the claim about why there was a tie to the child. Again, your honor I think it's one of these situations I would, I would liken it to. I think the difficulty was that with, with, with that kind of analysis your honor would be that child abuse would almost certainly just that would that would make it almost a per se nexus when somebody beats a child because you know why else does it says you are a burden to me, and I wish you were never born. In that circumstance, we would say it is likely because it was the child. Again, I'm not sure I'm not sure that that's that's right your honor I mean I think it's again it's a question does this record compel that conclusion, rather than, than just support it, even if I even if the agency I think could go either way on that you're on I don't think you have the sort of compulsion that this court would need to reject that and I think a similar point goes for the uncle. We have, we have just even less evidence of harm and more affirmative evidence of this was, there was a personal data dispute between between family members over money that that led to that and I think this court has a good number of decisions more input or to her Polaris so support the uncle point, but not the mother. Well, I think, and again I would just, I would just submit on on the only have a debt. There was no debt issue with the mother. No, that's, that's right your honor it is it is a different nature, nature of the claim but I would, I would say that it does get to the, there's, there's not a lot of evidence. I, I see I see my time is up but I would ask the court to deny the petition and we will circle back with the court with with more information. I need to know if my colleagues have additional questions before I let you go. Yes, your honor. I just want you to address the cat claim evidence and then that last point that we discussed with your opposing counsel about what would happen on remand, given that he's no longer in the country. Sure, your honor. Um, I think the cat claim your honor, I think the shortcoming with the cat claim here was the lack of really specific evidences to the petitioner himself. I think what the agencies were recognized and, and were relied on was that they looked at the, they looked at the evidence of country conditions, they saw it was about patterns, it was not specific to the petitioner. It noted big problems in, in, in, in the prison context due to overcrowding like but the agency also recognize look, you know, El Salvador prohibits torture. There's not a specific intent to harm here they've taken steps to address this overcrowding issue by by building some new prisons. Those points all defeat the, the nature of the torture claim so again, acknowledge contrary evidence that the agency certainly did that, but it did it reference that the study showing 80%. I don't believe so your honor, I would say that it's, it's still not clear that petitioner is a suspected gang member would end up in one of those, those prisons, based on that record your honor and even then I mean even if he were to end up in one of those. With, with respect to the IJ and the VA though you agree that neither one reference that study. I don't, I don't recall them specifically calling calling that piece out your honor. I think, and then on on the remand issue if you could just address that what what would happen. We are, if we were to say that the record record could be supplemented with the government commit to facilitating the ability of petitioner to participate in those proceedings even if he was still in El Salvador. I, I can I can try to find out your honor I I'm not sure of the mechanics of, you know, phone video teleconference those kinds of things but I can look into that I just, I'm, I want to. Pointedly, if the government's unable to facilitate him and participating in that. Is there any reason for us not to simply order the relief rather than remand, because then it would seem like the violation of the order did prejudice him. I, I, I think I, I take your honor's point I, I think I just want to be sure about what the options are available so I can describe those to the, to the court and we, I can, I can look into that. Any other questions. All right, thank you counsel. Thank you. Your honor. Your honor with the petitioners, I know I reserved three minutes for a bottle, but I don't know if I have three minutes left, but I wanted to seek leave just to respond for three minutes on the contempt issue. If that's appropriate. Thank you. I just, I want to be very brief. I know we've exceeded our time, but I'm very concerned about where we stand with respect to our client and the contempt issue from our observations at this oral argument today. And frankly, the government's actions for the last nine months, what we have seen is no ownership. No one taking ownership over this particular issue and our client who's in danger right now and has been in grave danger throughout a complete diffusion of responsibility among the various government actors involved, both in the deportation and with respect to his treatment in El Salvador. Frankly, a lack of seriousness and a lack of urgency. I don't take that lightly. I have never made these types of accusations in my career, but I think, frankly, the evidence amply reflects that here. It just doesn't seem to us that the government cares about our client and it shouldn't take this oral argument. I need a point of clarification. You described for us the treatment that your client suffered as a result of being incarcerated. Could you just clarify that was not the gang prison. That was not the gang prisons. That's correct. He was he was in pre trial custody. So he was not in one of the gang prisons. I think only individuals who were convicted in those facilities are in those facilities. And so I know that the government talks a lot about foreign policy sensitivities, and it's limited what it can do. That's precisely the point of coercive sanctions. What do you mean by what do you mean by sanctions if they're not aimed at helping your client? Are you referring to something other than trying to help your client? I think what the sanctions are designed to do are to compel the government's compliance with the underlying court orders. That's actually what we're seeking here. 1 option, as we mentioned quite extensively in our briefs is a daily coercive fine until our client is returned. We don't think the government has met its burden on impossibility, but as to the threshold question of just contempt, we've met all the elements. The order was clear. The government was on notice. And the order was in fact violated. All of those things are undisputed by the government. The impossibility defense that's raised by the government has to do with the possibility, impossibility to cure that goes to sanctions here. There is no dispute that it was possible to comply with the underlying court orders. The one last point I want to make with respect to how this transpired. One of the things we don't ask as much in our brief, but I think it warrants attention. Both of the state orders in this case, there was significant delay. I think from when oil ultimately transmitted the orders to ice and that I think played a large role in this occurrence. I would just say, with respect to the August 30th order, there was a four day delay. And with respect to the September 11th order, there was a 24 hour delay. All of that, I think, contributed to this egregious error. Thank you. Your honors. Thank you. Any questions from the panel? All right. Thank you. Counselor. Thank you.